MAGGIE MEANS, Administratrix of Taylor Means, v. THE CARO-
LINA CENTRAL RAILROAD CO.

(Decided May 5, 1899).

### Negligence—Engineer—Brakeman—Local Train— Evidence.

1. A local mixed train—passenger and freight combined—which
   runs daily between designated places, with schedule time for
   arrival and departure, with considerable passenger business,
   and schedule so arranged as to enable and encourage the peo-
   ple along the route to go to and fro, the same day, between
   their homes and important places—the object being to promote
   travel and to build up business in that line—ought to have
   a Conductor, and the defendant was negligent in not having
   provided one.

2. Whether or not the intestate's death was caused, without his fault,
   by the failure of defendant company to furnish a Conductor, is
   a question for the jury, under proper instructions as to the
   law, from the Court.

3. The declaration of the intestate, made while he was hurriedly
   going from the coach at the rear end of the train to the engine
   in front: "Get out of my way, I want to get to Mr. Hall (the
   engineer) to give him these tickets before the train gets two
   fast," was competent evidence as a part of the res gestae—and
   was properly admitted.

4. It was incompetent, after objection, for the engineer to testify,
   that he would have stopped the train in order that the intestate
   might have returned to the coach, if he had been requested so
   to do. This evidence was improperly admitted.

CIVIL ACTION for damages from alleged negligence of
defendant in occassioning the death of Taylor Means, intes-
tate of plaintiff, tried before *Starbuck, J.,* at October Term,
1898, of the Superior Court of MECKLENBURG County.

This case was heretofore tried and is reported in 122
N. C., 990.

On the night of December 4, 1894, the defendant company were running a mixed freight and passenger train between Charlotte and Rutherfordton, consisting of an engine, nine box cars, two flat cars, a conductor's·cab and a passenger coach, one of the flat cars being behind and next to the tender of said engine, and all under the management of an egineer. The train was operated without a conductor—the engineer usually collected fares himself, and sometimes by his direction, the intestate, Taylor Means, who was employed as brakeman to the passenger coach, would collect the tickets, and carry them over and along the cars and deliver them to the engineer.    There was evidence tending to show that on leaving Crouse's Station, Taylor Means, on the night in question had been thus engaged—a witness testifying that he saw Means running from the rear end of the train with a lantern, and as he passed, said, "Get out of my way, I want to get to Mr. Hall (the engineer) to give him these tickets before the train gets too fast."    The defendant·objected to this evidence of what Means said—but it was allowed.    A short distance further on—some three or four telegraph poles, on his return from the engineer's cab, Means appears to have fallen from the train—his lantern was found broken on the flat car next the tender, and his lifeless body, half in two, was found lying on the track.    The defendant offered to prove by Mr. Hall, the engineer, that he would have stopped the train in order that the intestate might have returned to the passenger coach, if he had been requested so to do.    The plaintiff objected to this evidence, but it was allowed, and plaintiff excepted.

This train ran daily from Rutherfordton to Charlotte, to and from with schedule hours so arranged as to allow persons to go to Charlotte, remain a few hours, and return to their homes, along the route, the same day.    A considerable number availed themselves of the accommodation, and the passenger business was a growing one, and had become valuable.

At the close of the evidence, his Honor intimated that he would charge the jury, that if they believed the evidence, that the plaintiff was not entitled to recover. Plaintiff excepted but in deference to his Honor's opinion submitted to judgment of nonsuit, and appealed.

*Messrs. Osborne, Maxwell & Keerans,* for plaintiff, (appellant).
*Messrs. Burwell, Walker & Cansler,* for defendant.

MONTGOMERY, J. When this case was here at February term, 1898, a new trial was ordered because of an error committed by his Honor on the trial below in instructing the jury that "it is the duty of a railroad company to have a conductor when there are passengers, and it is negligence not to have one." In reference to that instruction we said, "The rule would apply where the trains are passenger trains, or where a considerable part of the train was for the accommodation of passengers, and the passenger fare would be a considerable part of the inducement to run the train. But where the train is a freight train with a passenger car attached, it is a fair presumption that the passenger coach is purely for the accommodation of the public, and we can not say as a matter of law that it would be negligence (nothing else appearing) in a railroad company not to furnish a conductor on such trains." In the case as it was made up for this Court at the first hearing, nothing appeared as to the nature or destination of the train, except that it was one which consisted of an engine and eleven cars, including one passenger coach and a shanty car, and that it left Charlotte at four p. m. Nothing was said of the extent of the passenger traffic. We thought the charge of his Honor too broad to fit the facts of that case.

The case as presented now has some new features—and important ones. The train, a local one, was operated between Charlotte, by Lincolnton and Shelby. Its schedule time for departure from Shelby was 6 a. m., and for arrival at Charlotte 10 a. m. It left Charlotte at 4 p. m. The engineer testified that "at ordinary times we carried a good many passengers." It is apparent from the facts above stated that in the running of that train the passenger traffic was a matter of business consideration to the company; that the inducement to attach the passenger coach was not simply to oblige a passenger now and then who might wish to make an emergency trip or to visit some obscure station, but to establish a passenger business by a schedule so arranged as to enable and encourage the people along the route, and especially those in Shelby and Lincolnton, to visit the city of Charlotte for several hours and return to their homes at a reasonable hour on the night of the same day; and that the result was what was anticipated, a considerable passenger business.

His Honor, after the conclusion of the testimony was of opinion that the plaintiff could not recover, and upon intimating so much to the plaintiff's counsel, the plaintiff submitted to a nonsuit and appealed.

His Honor thought the case as developed did not differ materially from the case as brought out on the first trial. We think, however, that there was a substantial difference between the two cases in the respects pointed out by us. It was the duty of defendant company to have had a conductor for such a train as that of the defendant's was shown to have been by the undisputed evidence, and the defendant was negligent in not having provided one. What might be a sufficient crew to manage a train would ordinarily be a question for the jury, but whether or not it is negligence in a railroad company not to furnish a conductor, in a case like the one before

124—37

the Court, the evidence being undisputed, must be a question of law. The conductor need not have been purely and entirely a passenger conductor; a freight conductor might have been sufficient, under the circumstances, to have discharged the duties of a passenger conductor and his own at the same time. Whether or not the intestate's death was caused, without his fault, by the failure of the defendant company to furnish a conductor, is a question for the jury under proper instructions as to the law from the Court.

There were only two exceptions on points of evidence. The plaintiff was permitted, over the objection of the defendant, to introduce a declaration or statement made by the intestate while he was hurriedly going from the coach at the rear end of the train to the engine in front. The declaration was, "Get out of my way, I want to get to Mr. Hall (the engineer) to give him these tickets before the train gets too fast." The evidence was competent as a part of the *res gestae.* It was cotemporaneous with the main subject—the alleged killing of the intestate through the negligence of the defendant; it was made without forethought or design, and it helped to explain the main fact in the case. *Carter v. Buchanan,* 3 Ga., 513; 21 Am. and Eng. Enc. of Law, p. 99; Best on Evidence, 446. The declaration of the intestate was the natural and inartificial concomitant of a probable act which itself was a part of the *res gestae. Hunter v. State,* 40 N. J. Law, 540.

The defendant offered to show by the engineer that he would have stopped the train in order that the intestate might have returned to the coach if he had been so requested to do. We do not see how the evidence was material, as the case was then constituted, and it should not have been admitted, for it threw no light upon the matter. There was error in the ruling of his Honor, and there must be a new trial.